FEDERAL DEPOSIT INSURANCE CORPORATION, in its corporate capacity, as Manager of the FSLIC Resolution Fund and Statutory Successor to RTC, in its corporate capacity, Plaintiff,

v.

J. Alan ORNSTEIN, Alec Ornstein, Alan Goldberger, Walter Fish, George Kaminow, Michael Griffith, Andrew Kane, Louis Lefkowitz, Leonard Elman, Kenneth Stark, Howard Amron, Robert Liner, Louis Narotsky and Pamela Ornstein, Defendants.

No. 93–CV–5514 (JG).

United States District Court,
E.D. New York.

Nov. 1, 1999.

Kevin S. Law, Nixon Peabody LLP, Garden City, NY, Robert C. Bernius, Robert P. Fletcher, Washington DC, for plaintiff.

Ronald J. Devito, Jericho, NY, for defendant Michael Griffith.

George Kaminow, Hewlett, NY, defendant pro se.

## MEMORANDUM AND ORDER

GLEESON, District Judge.

In December of 1993, Federal Deposit Insurance Corporation ("FDIC") commenced the instant action, seeking to hold Central Federal Savings Bank's ("CFS") directors and officers liable for numerous alleged acts of malfeasance committed by the bank. The only remaining defendants, George Kaminow and Michael Griffith, have asserted a number of affirmative defenses to the claims against them. The FDIC has moved in limine to strike some of these defenses and for an order precluding defendants from introducing any evidence in support of them.

For the reasons discussed below, the motion is granted in part and denied in part.

### FACTS

FDIC's complaint alleges that outside auditors and regulators repeatedly warned CFS's board and senior officers about problems with the bank's finances and lending practices but that CFS took no remedial action. (Amended Complaint ¶¶ 108–22.) In particular, the FDIC alleges that seven loans—all of which led to defaults—were improvidently made. (Id. ¶¶ 179–527.) The FDIC took over CFS as receiver in December 1990 and subsequently initiated this action on behalf of the bank against its directors and officers, alleging negligence, gross negligence, and breach of fiduciary duty.[1] (Id. ¶¶ 123–78.)

1. Because of the complex bureaucratic history of the regulation of financial institutions, the statement in the text actually oversimplifies matters. When CFS failed on December 7, 1990, it was taken over by the Resolution Trust Corporation ("RTC") as receiver, which commenced management and liquidation of CFS's assets. Some of the assets, including CFS's causes of action against these defendants, were "transferred" to RTC Corporate.

In their answers, Griffith and Kaminow raise a number of affirmative defenses. The defenses relevant to this motion are: the second (that their conduct should be protected by the business judgment rule); the third (that their actions as directors "were mandated by federal regulatory agencies having or asserting jurisdiction over the acts and actions of the bank and its directors and officers"); the fourth (that any losses were caused not by defendants but by "plaintiff and its predecessor"); the fifth (that the plaintiff failed to mitigate damages); and the sixth (that the plaintiff failed to provide defendants with directors and officers liability insurance). The FDIC has moved to strike each of these defenses and has asked for an order in limine precluding defendants from introducing any evidence regarding pre-failure regulatory conduct or post-intervention actions by government agencies in handling or liquidating CFS's assets.

### DISCUSSION

A. *The Standard for Motions to Strike Affirmative Defenses*

▮▮ Rule of Civil Procedure 12(f) authorizes a court to strike from an answer "any insufficient defense." Such motions are "not favored," but will succeed if "it appears to a certainty that plaintiffs would succeed despite any state of the facts which could be proved in support of the defense." *William Z. Salcer, Panfeld, Edelman v. Envicon Equities Corp.*, 744 F.2d 935, 939 (2d Cir.1984) (quoting *Durham Indus., Inc. v. North River Ins. Co.*, 482 F.Supp. 910, 913 (S.D.N.Y.1979)), *vacated on other grounds*, 478 U.S. 1015, 106 S.Ct. 3324, 92 L.Ed.2d 731 (1986). When

When the statutory authorization for the RTC expired, it was replaced by operation of law by FDIC Corporate (now the plaintiff in this action). *See* FDIC Memorandum of Law at 9 n. 3. The relevant legal authority of the RTC and FDIC is the same, *see RTC v. CedarMinn Bldg. Ltd. Partnership*, 956 F.2d 1446, 1450 n. 5 (8th Cir.1992), and to simplify matters, I will indulge the fiction that the RTC was never involved in the case.

an affirmative defense is unsupportable as a matter of law, it should be stricken in order to avoid unnecessary litigation on the question. *See FDIC v. Eckert Seamans Cherin & Mellott*, 754 F.Supp. 22, 23 (E.D.N.Y.1990).

 The Second Circuit has cautioned against deciding difficult questions of law on a Rule 12(f) motion to strike, given that such motions are typically made at the most preliminary stages of litigation.[2] *See Envicon Equities*, 744 F.2d at 939. This case, however, has been pending for nearly six years; discovery is either complete or very nearly so; and we are on the eve of trial. Moreover, FDIC seeks an order in limine precluding introduction of evidence on the disputed defenses. That application requires an analysis of the legal viability of the defenses. There is no impediment, at this late stage of the case, to engaging in that analysis. For these reasons, the motion to strike provides an appropriate vehicle for resolution of these questions.

### B. The Business Judgment Rule

 The parties agree that New York law will determine the liability standard applied to defendants' actions, *see Atherton v. FDIC*, 519 U.S. 213, 226, 117 S.Ct. 666, 136 L.Ed.2d 656 (1997) (rejecting contention that standard of care should come from federal common law), but they disagree on what that standard should be. In their second affirmative defense, the defendants contend that their conduct should be judged against the "business judgment rule." This rule "prohibits judicial inquiry into actions of corporate directors taken in good faith and in the exercise of honest judgment in the lawful and legitimate furtherance of corporate purposes." *Levandusky v. One Fifth Ave. Apartment Corp.*, 75 N.Y.2d 530, 537–538, 554 N.Y.S.2d 807,

553 N.E.2d 1317 (1990) (internal quotation marks omitted). Short of a breach of fiduciary duty, directors will not be liable for their good faith actions, even if turns out that those actions were "unwise or inexpedient." *Id.* at 538, 554 N.Y.S.2d 807, 553 N.E.2d 1317.

The FDIC argues that instead of the business judgment rule a simple negligence standard applies, and I agree. In a 1994 opinion, Judge Ross thoroughly examined this question and concluded that New York law holds directors of a "banking institution" liable for simple negligence. *See RTC v. Gregor*, 872 F.Supp. 1140, 1150–51 (E.D.N.Y.1994) (citing *Litwin v. Allen*, 25 N.Y.S.2d 667, 678 (Sup.Ct. 1940); *Broderick v. Marcus*, 152 Misc. 413, 272 N.Y.S. 455, 461 (Sup.Ct.1934)). The defendants have not cited any subsequent authority that would undermine the analysis in *Gregor*, which I adopt. The defendants' second affirmative defense is therefore struck.

### C. FDIC Corporate vs. FDIC Receiver

 As a threshold matter, the FDIC contends that the affirmative defenses four through six (alleging that any losses were caused by the FDIC or its predecessor; that the FDIC failed to mitigate damages; and that the FDIC failed to provide officers and directors insurance) are unsustainable because they are actually claims against "FDIC Receiver," a distinct legal entity from "FDIC Corporate," which is litigating this action. FDIC Corporate is charged with "insur[ing] the deposits of all insured banks as provided in this chapter." 12 U.S.C. § 1821(a)(1). FDIC Receiver, on the other hand, steps into the shoes of a financial institution in order to operate it and, if necessary, liquidate its assets. *See id.* § 1821(d)(2).

---

2. In fact, a motion to strike is supposed to be made within 20 days after service of the pleading in question. *See* Fed.R.Civ.P. 12(f). However, the court may strike an insufficient defense *sua sponte* "at any time," *id.*, and may choose to entertain an untimely Rule 12(f) motion, *see Ciminelli v. Cablevision*, 583 F.Supp. 158, 161 (E.D.N.Y.1984). The defendants have not objected to the FDIC motion on timeliness grounds, and I choose to consider the motion on the merits.

The Second Circuit has held that FDIC Corporate and FDIC Receiver are two "discrete legal entities," and, as such, "Corporate FDIC is not liable for wrongdoings by Receiver FDIC." *FDIC v. Bernstein*, 944 F.2d 101, 106 (2d Cir.1991) (quoting *FDIC v. Roldan Fonseca*, 795 F.2d 1102, 1109 (1st Cir.1986)); *see also Dababneh v. FDIC*, 971 F.2d 428, 432 (10th Cir.1992). The facts of *Bernstein*, however, demonstrate why the rule of that case does not support FDIC Corporate's motion to strike affirmative defenses four through six, all of which pertain to actions or omissions by FDIC Receiver.

*Bernstein* involved a complicated set of transactions, but for present purposes only certain facts are salient. FDIC, acting as receiver for Guardian Bank, sued Bernstein seeking to collect on a $175 million personal guaranty he had provided for a loan Guardian Bank provided to Guardian Diversified Services, Inc. ("GDSI"). *See Bernstein*, 944 F.2d at 102. (GDSI's inability to repay this loan had led to the failure of Guardian.) GDSI could not repay the loan because its subsidiary's participation in a mortgage-backed securities program had been terminated. *See id.* at 103. Bernstein alleged that, because this termination was wrongful and had been instigated by FDIC Corporate, he could not be held liable on the guaranty. *See id.* at 105. This is the contention that the Circuit concluded was unsustainable as a matter of law: It involved the conduct of an entity not party to the action. *See id.* at 106.

■ The defendants' allegations in affirmative defenses four through six are quite different. They involve the conduct of FDIC Receiver, as receiver. True, FDIC Corporate is the plaintiff in this case, but that is so only because FDIC Receiver assigned this cause of action to FDIC Corporate. (FDIC Memorandum of Law at 9 n. 3.) It is horn book law that the assignee

of a cause of action takes it subject to any defenses that could have been raised against the assignor. *See* 6A N.Y.Jur.2d *Assignments* § 66 (1997). Therefore, the fact that FDIC Receiver and FDIC Corporate are two separate entities cannot prevent the defendants from raising these defenses. If it could, these entities could extinguish otherwise valid defenses simply by shifting causes of action back and forth.[3]

■ The FDIC's *Bernstein* argument does, however, serve to defeat the third affirmative defense, which apparently seeks to shift the blame for defendants' conduct to the actions of (non-FDIC) regulatory agencies taken before CFS's failure. This is analogous to the defense raised by the defendant in *Bernstein*, and it is foreclosed by the rule of that case. *See Bernstein*, 944 F.2d at 106; *see also RTC v. Sands*, 863 F.Supp. 365, 372–73 (N.D.Tex. 1994) ("[P]re-conservatorship conduct of federal banking regulators cannot be attacked by directors."); *FDIC v. Cheng*, 832 F.Supp. 181, 187–88 (N.D.Tex.1993). Accordingly, the third affirmative defense is struck. The fourth affirmative defense, the basis of which is unclear, is struck to the extent that it relies on pre-receivership conduct by federal regulators.

### D. The Impact of O'Melveny on the "No Duty" Rule

Were I deciding this issue before the Supreme Court's decision in *O'Melveny & Myers v. FDIC*, 512 U.S. 79, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994), I would quickly grant the FDIC's motion to strike affirmative defenses four through six. (Griffith virtually concedes this point. *See* Defendant Michael Griffith's Memorandum of Law at 13.) Griffith contends, however, that *O'Melveny* changed the landscape. Before evaluating that contention, I will briefly describe the state of the law before the Supreme Court decided that case.

---

**3.** When pressed at oral argument on this issue, counsel for the FDIC appeared to retreat from it somewhat, contending that the FDIC's motion is founded not on the FDIC Receiver/Corporate distinction, but on the "no duty" rule addressed in the next section.

Prior to 1994, there was an emerging consensus in the circuit courts that, as a matter of federal common law, affirmative defenses alleging (for instance) a failure to mitigate damages could not be raised against the FDIC. This conclusion was called the "no duty rule," because it rested on the premise that the FDIC owed no duty to officers and directors when acting as receiver of a failed financial institution. *See FDIC v. Bierman,* 2 F.3d 1424, 1438 (7th Cir.1993). As the Seventh Circuit put it,

> [N]othing could be more paradoxical or contrary to sound policy than to hold that it is the public which must bear the risk of errors of judgment made by its officials in attempting to save a failing institution—a risk which would never have been created but for defendants' wrongdoing in the first instance.

*Id.* (quoting *Federal Sav. & Loan Ins. Corp. v. Roy,* No. JFM–87–1227, 1988 WL 96570, at *4 (D.Md. June 28, 1988)). Moreover, the FDIC must be allowed to fulfill its statutory mandate of replenishing the insurance fund and "maintain[ing] confidence" in the banking system without the fear of judicial second-guessing. *See id.* at 1439. Finally, the *Bierman* court found support for its position by analogizing to the discretionary function exception to the Federal Tort Claims Act (FTCA). *See id.* at 1441; *see also United States v. Gaubert,* 499 U.S. 315, 334, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991) (holding that the discretionary function exception of the FTCA shielded United States from tort liability for allegedly negligent actions taken by banking regulators).

The Fifth Circuit followed *Bierman* and extended its holding by preventing a defendant from arguing that losses incurred by the failed bank were causally attributable to the FDIC's poor management of its assets after taking it over. *See FDIC v. Mijalis,* 15 F.3d 1314, 1323–24 (5th Cir. 1994). The court termed this argument by the defendants an attempted "end-run" around the rule that the FDIC had no

duty to mitigate damages. *See id.* at 1327. The Tenth Circuit also adopted *Bierman.* *See FDIC v. Oldenburg,* 38 F.3d 1119, 1121 (10th Cir.1994). Although issued four months after the Supreme Court's opinion in *O'Melveny, Oldenburg* did not cite the case, much less discuss its possible relevance to the question.

The question presented by the instant motion is whether the no duty rule was undermined by the Supreme Court's decision in *O'Melveny.* I conclude that it was.

*O'Melveny* involved a suit by the FDIC as receiver for American Diversified Savings Bank ("ADSB") against the law firm of O'Melveny & Myers, which had represented ADSB in two real estate transactions. *See O'Melveny,* 512 U.S. at 81, 114 S.Ct. 2048. The FDIC, which had caused ADSB to refund money to investors who said they had been bilked in connection with the two real estate transactions, contended that O'Melveny & Myers had been negligent and breached its fiduciary duty in connection with the representation. *See id.* at 82, 114 S.Ct. 2048. In a motion for summary judgment based on California law, the law firm argued that the knowledge of ADSB's controlling officers about their fraudulent conduct was imputed to ADSB; that the same knowledge was therefore imputed to the FDIC, which as receiver stood in the shoes of ADSB; and that the FDIC was therefore estopped from pursuing its claim against O'Melveny & Myers. *See id.* The FDIC responded that California law was not relevant to the question, which was a matter of federal common law.

The Supreme Court rejected the FDIC's contention. The Court first concluded that California law governed the question whether the knowledge of corporate officers about their own misconduct could be imputed to the corporation. *See id.* at 83, 114 S.Ct. 2048. Noting the general rule that " '[t]here is no federal general common law,' " the Court argued that "the remote possibility that corporations may go into federal receivership is no conceiva-

ble basis for adopting a special federal common-law rule divesting States of the authority over the entire law of imputation." *Id.* (quoting *Erie R. Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938)).

The more substantial question presented was whether the knowledge imputed to the corporation could in turn be imputed to the FDIC when suing as receiver. *See id.* at 85, 58 S.Ct. 817. The Court first rejected the FDIC's contention that the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA), Pub L. 101–73, 103 Stat. 183, evinced "high federal interest" in the receivership of failed financial institutions and therefore "confirms the courts' authority to promulgate" federal common law. *O'Melveny,* 512 U.S. at 86, 114 S.Ct. 2048. Citing the principle of *inclusio unius, exclusio alterius,* the court said that this argument was "demolished" by the fact that FIRREA included a number of specific provisions on claims and defenses in actions by the FDIC as receiver, but none on imputation. *See id.* at 86–87, 114 S.Ct. 2048. "[W]e [will not] adopt a court-made rule to supplement federal statutory regulation that is comprehensive and detailed; matters left unaddressed in such a scheme are presumably left subject to the disposition provided by state law." *Id.* at 85, 114 S.Ct. 2048.

The Court was unwilling to rest its decision entirely on FIRREA, however, because that statute was enacted in 1989, while the FDIC became receiver of ADSB in 1986. *See id.* at 87, 114 S.Ct. 2048. It therefore went on to conclude that it would reach the same result even if FIRREA were not part of the case. *See id.* at 87, 114 S.Ct. 2048. Common law making by a federal court is appropriate only when "there is a 'significant conflict between some federal policy or interest and the use of state law.'" *Id.* (quoting *Wallis v. Pan Am. Petroleum Corp.,* 384 U.S. 63, 68, 86 S.Ct. 1301, 16 L.Ed.2d 369 (1966)). Yet the FDIC had failed to identify such a conflict. There was no significant federal interest in uniformity because the rule in question did not control the "primary conduct" of a federal agency, but rather the already-completed "primary conduct" of private entities. *Id.* at 88, 114 S.Ct. 2048. Additionally, the Court rejected the FDIC's contention that adoption of California law on this question would drain money from the FDIC insurance fund. Terming this a "more money" argument, the Court noted the absence of a "federal policy that [the FDIC] should always win." *Id.*

There is a significant split among the district courts as to whether *O'Melveny* abrogates the no duty rule. *Compare, e.g., FDIC v. Gladstone,* 44 F.Supp.2d 81, 86–88 (D.Mass.1999) (no duty rule abrogated), *and RTC v. Liebert,* 871 F.Supp. 370, 371–73 (C.D.Cal.1994) (same), *and RTC v. Ross,* Civ. A. No. 2:94CV20(P)(S), at *4–6 (S.D.Miss. August 26, 1994) (same), *with FDIC v. Healey,* 991 F.Supp. 53, 59–62 (D.Conn.1998) (no duty rule survives), *and RTC v. Bright,* 157 F.R.D. 397, 400 (N.D.Tex.1994) (same), *and Sands,* 863 F.Supp. at 370 (same). As mentioned previously, the only circuit court to consider the no duty rule after *O'Melveny* was the Tenth Circuit in *FDIC v. Oldenburg,* 38 F.3d 1119, 1121 (10th Cir.1994), which adopted the rule, but did not even cite *O'Melveny.*

In my view, the district court in *Liebert* correctly analyzed this question. As the *Liebert* court emphasized, the opinion in *O'Melveny* has two distinct sections, which provided alternative holdings in support of its decision. *See Liebert,* 871 F.Supp. at 371. In the first section, the Court assumed that FIRREA applied and concluded that it would be inappropriate to use the federal common law-making power to supplement the detailed statutory scheme therein. In the second section (which the Court included because it was unclear whether FIRREA applied to the receivership at issue in that case), the Court concluded that even if FIRREA did not govern the case, it would be inappropriate to

adopt a federal common law rule of decision.

■ Here, as in *Liebert*, only the first part of *O'Melveny* applies because it is undisputed that FIRREA governs this case. *See Liebert*, 871 F.Supp. at 371. The FDIC's argument here therefore fails for the same reason that its argument failed in the first portion of *O'Melveny*. FIRREA includes a number of tailored rules to be applied in suits by federal receivers, yet it does not include a provision barring the affirmative defense of failure to mitigate damages. "What Congress chose to put in is to be enforced, and what it left out is not to be added by judicial fiat." *Liebert*, 871 F.Supp. at 372; *see also O'Melveny*, 512 U.S. at 85, 114 S.Ct. 2048 ("[M]atters left unaddressed in such a scheme are presumably left subject to the disposition provided by state law.").

The FDIC relies heavily on the second part of *O'Melveny*, where the Court stated that the power to fashion federal rules of decision is "limited to situations where there is a 'significant conflict between some federal policy or interest and the use of state law.'" *O'Melveny*, 512 U.S. at 87, 114 S.Ct. 2048 (quoting *Wallis*, 384 U.S. at 68, 86 S.Ct. 1301). Specifically, the FDIC strenuously argues that permitting the defenses in question would create a significant conflict with the important federal interest in maintaining the FDIC's discretionary authority. But that argument is inapposite here. Congress has stepped into this arena with a comprehensive statutory scheme. My task is not to determine whether I should fashion a federal rule in the absence of statutory guidance (in which case the FDIC's argument might have force), but rather to construe FIRREA. *See Liebert*, 871 F.Supp. at 372.

The FDIC attempts to distinguish *O'Melveny* by pointing to the following language from the opinion: "The rules of decision at issue here do not govern the primary conduct of the United States or any of its agents or contractors, but affect only the FDIC's rights and liabilities, as receiver, with respect to primary conduct on the part of private actors that has already occurred." *O'Melveny*, 512 U.S. at 88, 114 S.Ct. 2048. In the instant case, the FDIC argues, the "primary conduct" of the FDIC—its management of the bank after assuming control of it—is very much at issue.

■ This argument is true as far as it goes. Unlike in *O'Melveny*, the affirmative defense here is based squarely on the conduct of the federal actors. In the absence of FIRREA, that is precisely the sort of interest that might have justified the judicial creation of a federal rule. However, the argument does not go far because the quoted language comes from the second portion of *O'Melveny*, in which the Court discussed federal common law making absent a detailed statutory scheme. Once Congress has imposed a comprehensive framework like FIRREA, it is presumed to have considered and adequately protected such federal interests, and interstitial federal common law making is impermissible. *See O'Melveny*, 512 U.S. at 85, 114 S.Ct. 2048; *Liebert*, 871 F.Supp. at 373; *see also FDIC v. Schreiner*, 892 F.Supp. 848, 857 (W.D.Tex.1995) ("Any reliance on the quoted sentence from the second part of *O'Melveny*, which analyzed the application of federal common law in the absence of FIRREA, to construe the first part of *O'Melveny*, which analyzed the application of federal common law in post-FIRREA suits, is wholly misplaced.").

In an attempt to win the battle even if it is fought under the first part of *O'Melveny*, the FDIC argues that there are indeed a number of "explicit statutory commands" in FIRREA that would disallow the affirmative defenses offered here. These are the provisions offered by the FDIC, which govern its powers when acting as receiver:

- It may "make any other disposition of any matter concerning the institution, as the Corporation determines is in the best interests of the institution, the

depositors of the institution, and the Corporation." 12 U.S.C. § 1821(c)(13)(B)(ii).

- It may "take any action authorized by this chapter, which the Corporation determines is in the best interest of the depository institution, its depositors, or the Corporation." *Id.* § 1821(d)(2)(J)(ii).

- It may "liquidate or sell any part of the assets of an insured depository institution which is now or may hereafter be in default." *Id.* § 1823(d)(4).

These general provisions certainly vest discretion in the FDIC when acting as receiver, but it is too much of a leap from them to a highly specific rule preempting state laws relating to mitigation of damages, and I decline to give the statute that construction. *See Woodward Governor Co. v. Curtiss–Wright Flight Sys.,* 164 F.3d 123, 127 (2d Cir.1999) ("[A]n actual, significant conflict between a federal interest and state law must be 'specifically shown,' and not generally alleged." (quoting *Atherton,* 519 U.S. at 218, 117 S.Ct. 666)). If that creates a gap that impairs the legitimate interests of the FDIC, only Congress can fill the gap.[4] *See Northwest Airlines, Inc. v. Transport Workers Union,* 451 U.S. 77, 97, 101 S.Ct. 1571, 67 L.Ed.2d 750 (1981) ("[T]he authority to construe a statute is fundamentally different from the authority to fashion a new rule ... which Congress has decided not to adopt."); *O'Melveny,* 512 U.S. at 85, 114 S.Ct. 2048 ("Nor would we adopt a court-made rule to supplement federal statutory regulation that is comprehensive and detailed; matters left unaddressed in such a

scheme are presumably left subject to the disposition provided by state law.")

In addition, although the FDIC contends that the imposition of a state law duty to mitigate conflicts with the broad discretion vested in the FDIC by FIRREA, a careful reading of the provisions it cites suggests otherwise. Under FIRREA, the FDIC must conduct the transactions in a way that

(i) maximizes the net present value return from the sale or disposition of such assets;

(ii) minimizes the amount of any loss realized in the resolution of cases;

(iii) ensures adequate competition and fair and consistent treatment of offerors;

(iv) prohibits discrimination on the basis of race, sex, or ethnic groups in the solicitation and consideration of offers; and

(v) maximizes the preservation of the availability and affordability of residential real property for low- and moderate-income individuals.

12 U.S.C. § 1821(d)(13)(E).

With the possible exception of the fifth requirement (which the FDIC does not allege has any relevance to this case), these generalized statutory duties are entirely consistent with a duty to mitigate. *See FDIC v. Gladstone,* 44 F.Supp.2d 81, 87 (D.Mass.1999). In fact, the first two requirements appear to be another way of stating the content of the duty (to get top dollar for sold assets), if not the party to whom the duty is owed. *See National Credit Union Admin. v. First Union Capital Mkts. Corp.,* 189 F.R.D. 158, 168 n. 11 (D.Md.1999) ("[W]hile there is no specific

---

**4.** The FDIC also invokes *United States v. Gaubert,* 499 U.S. 315, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991), in which the Supreme Court concluded that the conduct of federal banking regulators qualified for the discretionary function exception to the Federal Tort Claims Act (FTCA). To the extent that the FDIC suggests *Gaubert* is directly applicable, I reject its suggestion. The FTCA applies to tort claims raised against the United States, and is therefore inapplicable here. If the

statute does not apply, the exception to it does not apply either. *See Gladstone,* 44 F.Supp.2d at 88. To the extent that the FDIC relies on an analogy based on *Gaubert's* conclusion that bank regulators exercise discretion, I reject its argument for the same reasons discussed in the text. A general statement of discretionary authority does not present a "significant conflict" with a specific state law duty to mitigate. *O'Melveny,* 512 U.S. at 87, 114 S.Ct. 2048.

duty to the officers and directors, the statute requires that the FDIC maximize its return on liquidated assets and minimize its loss in resolving claims against the failed institution. Failure to so proceed would result in the FDIC acting contrary to its mandate and, hence, in a non-discretionary manner.").

Further support for my conclusion that the statutory provisions cited by the FDIC do not preempt state law on mitigation of damages comes from *Atherton v. FDIC*, 519 U.S. 213, 117 S.Ct. 666, 136 L.Ed.2d 656 (1997). That case involved, *inter alia*, a provision of FIRREA stating that a director or officer of a financial institution may be liable in an action by the FDIC "for gross negligence, including any similar conduct or conduct that demonstrate a greater disregard of a duty of care (than gross negligence) including intentional tortious conduct." 12 U.S.C. § 1821(k). The question presented was whether this provision preempted a state law standard of care that would hold officers and directors liable for simple negligence. The Court's answer was no:

> In our view, the statute's 'gross negligence' standard provides only a floor—a guarantee that officers and directors must meet at least a gross negligence standard. It does not stand in the way of a stricter standard that the laws of some States provide.

*Atherton*, 519 U.S. at 227, 117 S.Ct. 666.

This holding, especially when read in conjunction with *O'Melveny*, evinces a strong indication from the Supreme Court that FIRREA must be read against the backdrop of state law. *See Atherton*, 519 U.S. at 218, 117 S.Ct. 666 ("Nor does the existence of related federal statutes automatically show that Congress intended courts to create federal common-law rules, for 'Congress acts ... against the back-

ground of the total corpus juris of the states....'" (quoting *O'Melveny*, 512 U.S. at 80, 114 S.Ct. 2048) (alterations in *Atherton*)). In *Atherton*, a specific statutory standard of care was held insufficient to preempt a conflicting state standard. If this was the effect of FIRREA in *Atherton*, the FDIC's argument must certainly fail here, where the statutory provisions it invokes are more vague and lacking entirely in conflict with state law.

It is true that the *Atherton* court deemed significant the gross negligence provision's savings clause, which says that "[n]othing in this paragraph shall impair or affect any right of the Corporation under other applicable law." *Id.* at 227–28, 117 S.Ct. 666 (quoting 12 U.S.C. § 1821(k)). That clause is not implicated in this case, but another one performs a similar function. Under FIRREA, the FDIC as receiver succeeds to "all rights, titles, powers, and privileges" of the financial institution. 12 U.S.C. § 1821(d)(2)(A)(i). This provision "places the FDIC in the shoes of the insolvent S & L, to work out its claims under state law, except where some provision in the extensive framework of FIRREA provides otherwise." *O'Melveny*, 512 U.S. at 86, 114 S.Ct. 2048; *cf. National Credit Union Admin.*, 189 F.R.D. 158, 1999 WL 636567, at *11 (noting that allowing a receiver to succeed to causes of actions but not to defenses "would sanction an imbalance not mandated by the remedial legislation on the financial institutions and the crisis from which the legislation arose"). As demonstrated, FIRREA does not provide otherwise, so state law applies.[5]

## D. *New York Law*

 My conclusion that New York law will govern the availability of the contested defenses does not end the inquiry. The

---

5. The FDIC's argument that allowing defendants to raise this defense could, in some cases, reduce recovery for the FDIC is not a reason to engage in judicial lawmaking. *See O'Melveny*, 512 U.S. at 88, 114 S.Ct. 2048

("[T]here is no federal policy that the fund should always win. Our cases have previously rejected 'more money' arguments remarkably similar to the one made here.").

287

parties disagree over what answer the New York courts would give to this question.

New York is a "comparative negligence" state. In all tort actions, it requires that "the amount of damages otherwise recoverable ... be diminished in the proportion which ... culpable conduct attributable to the claimant ... bears to the culpable conduct which caused the damages." N.Y. C.P.L.R. § 1411. A defendant seeking to reduce damages in this way must do so by raising an affirmative defense and carrying the burden of persuasion on the issue. *See* *id.* § 1412.

The FDIC attributes significance to the fact that there are no New York opinions applying this statute (and the duty to mitigate embedded in it) to a federal or state agency acting as receiver. This analysis, however, gets the analysis backward. The duty to mitigate is the default rule in New York. Absent a New York opinion *declining* to apply the duty in a case such as this one, I must assume that the requirement holds.

I therefore deny the motion to strike the fourth affirmative defense (to the extent that it relies on post-receivership conduct) and the fifth affirmative defense (on mitigation of damages). None of the papers submitted in connection with this motion explains the nature of the sixth affirmative defense (regarding director's and officer's insurance) or its relevance to the case. Accordingly, I do not have sufficient information to evaluate this defense and will not do so on a motion to strike, a procedural vehicle "not favored" in this Circuit. *William Z. Salcer, Panfeld, Edelman v. Envicon Equities Corp.,* 744 F.2d 935, 939 (2d Cir.1984), *vacated on other grounds,* 478 U.S. 1015, 106 S.Ct. 3324, 92 L.Ed.2d 731 (1986). The motion to strike affirmative defense six is therefore denied.

## CONCLUSION

The motion to strike (and corresponding motion in limine) is granted as to affirmative defenses two, three, and four (to the extent that defense relies on pre-receivership conduct). The motion to strike (and corresponding motion in limine) is denied as to affirmative defenses four (to the extent that defense relies on post-receivership conduct), five, and six.

So Ordered.